UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

REX DUANE STEPHENSON,            Case No. 6:17-cv-00685-MC

       Petitioner,                                 OPINION AND ORDER

    v.

BRANDON KELLY, Superintendent,
Oregon St. Penitentiary,

       Respondent.
_____

MCSHANE, District Judge:

      Petitioner seeks federal habeas relief pursuant to 28 U.S.C. § 2254, alleging the deprivation of his right to the effective assistance of counsel and actual innocence. Respondent argues that petitioner's claims are procedurally defaulted and otherwise lack merit. Based on the record before the court, petitioner fails to establish he is entitled to federal habeas relief. The petition is DENIED.

## BACKGROUND

      In July 2006, petitioner was indicted on one count of Attempted Rape in the First Degree, two counts of Unlawful Sexual Penetration in the Second Degree, one count of Sodomy

in the Second Degree, and forty-two counts of Sexual Abuse in the First Degree. Resp't Ex. 102. Thirty-nine of the charges arose from petitioner's abuse of his preteen stepdaughter, MH. The remaining three charges arose from petitioner's abuse of his step-granddaughter, BJ.

In March 2007, petitioner proceeded to a jury trial. MH and BJ testified, along with MH's older sister and several caseworkers and police officers. *See generally* Trial Transcript (Tr.) (ECF No. 26). Specifically, MH testified that petitioner sexually abused her while viewing child pornography on his computer, while playing "Strip Poker" with her, and while taking her for car rides to a nearby town. MH also testified that she was awakened one night as petitioner entered her bedroom and anally penetrated her. Tr. 103-112, 114-16, 120-21.[1] In addition to testifying himself, petitioner called his wife (MH's mother) and several other family members and friends to testify in his defense.

Following guilty verdicts on all charges, the trial court sentenced petitioner to concurrent and consecutive sentences totaling 300 months of imprisonment. Resp't Exs. 101, 138.

Following an unsuccessful direct appeal, petitioner sought post-conviction relief (PCR), alleging that trial counsel provided ineffective assistance by failing to adequately cross-examine witnesses, failing to elicit favorable testimony from defense witnesses, and failing to object to improper statements made during closing argument. Resp't Ex. 107. The PCR court denied relief on all claims, and petitioner appealed. Resp't Exs. 140-43. The Oregon Court of Appeals affirmed without opinion, and the Oregon Supreme Court denied review. Resp't Exs. 143 at 17, 144-45.

---

[1] Citations to the transcript refer to the page number at the bottom of the page, in the lower right corner.

On May 1, 2017, petitioner filed the instant habeas action. On August 8, 2017, petitioner filed an Amended Petition seeking dismissal of the charges or a new trial within sixty days. Am. Pet. at 6.

## DISCUSSION

In his Amended Petition, petitioner alleges two grounds for relief. First, petitioner asserts nine subparts alleging the ineffective assistance of counsel. Second, petitioner alleges actual innocence. *See* Am. Pet. (ECF No. 13). Respondent maintains that most of these claims are unexhausted and the remaining claims were reasonably denied by the PCR court.

A. Procedural Default and Actual Innocence

Respondent maintains that Ground One subparts (1), (4), and (6) through (9), and portions of subparts (2) and (5), were not fairly presented to the Oregon courts and are now barred from federal review through procedural default.

A state habeas petitioner must exhaust all available state court remedies before a federal court may consider granting habeas corpus relief. 28 U.S.C. § 2254(b)(1)(A); *see also Baldwin v. Reese*, 541 U.S. 27, 29 (2004). To meet the exhaustion requirement, the petitioner must "fairly present" a federal claim to the State's highest court "in order to give the State the opportunity to pass upon and to correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995) (per curiam) (quotation marks omitted); *Cooper v. Neven*, 641 F.3d 322, 326 (9th Cir. 2011) ("Exhaustion requires the petitioner to 'fairly present' his claims to the highest court of the state.").

If a claim was not fairly presented to the state courts and no state remedies remain available for the petitioner to do so, the claim is barred from federal review through procedural default. *See Coleman v. Thompson*, 501 U.S. 722, 732, 735 n.1 (1991); *Sandgathe v. Maass*,

314 F.3d 371, 376 (9th Cir. 2002) ("A procedural default may be *caused* by a failure to exhaust federal claims in state court."). A federal court may consider unexhausted and procedurally barred claims only if the petitioner demonstrates cause for the default and actual prejudice, or if the lack of federal review would result in a "fundamental miscarriage of justice." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Coleman*, 501 U.S. at 750.

Although petitioner arguably alleged all subparts of Ground One in his amended PCR petition, Resp't Ex. 107, he did not raise subparts (1), (4), or (6) through (9) during his PCR appeal. Resp't Exs. 141, 143. Likewise, petitioner did not raise several claims alleged in subparts (2) and (5) regarding counsel's failure to cross-examine witnesses and failure to object during voir dire and opening arguments. *Id.* Petitioner does not dispute that these grounds are unexhausted, and they are now procedurally defaulted.

Nonetheless, in Ground Two, petitioner asserts a claim of actual innocence to excuse the procedural default of these claims. Pet'r Br. at 43 (ECF No. 50). A colorable claim of actual innocence may serve as a "gateway" to allow the consideration of claims that would otherwise be procedurally barred. *Schlup v. Delo*, 513 U.S. 298, 316 (1995); *see also Smith v. Baldwin*, 510 F.3d 1127, 1139-40 (9th Cir. 2007) (en banc). "In order to pass through the *Schlup* actual innocence gateway, a petitioner must demonstrate that in light of new evidence, it is more likely than not that no reasonable juror would have found the petitioner guilty beyond a reasonable doubt." *Jones v. Taylor*, 763 F.3d 1242, 1247 (9th Cir. 2014) (internal quotation marks, citations, and alterations omitted). "This new evidence must be reliable, and the reviewing court 'may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence.'" *Id.* (quoting *Schlup,* 513 U.S. at 332). Ultimately, the

court must consider all evidence of record to "make a probalistic determination about what reasonable, properly instructed jurors would do." *Schlup*, 513 U.S. at 329.

Petitioner submits several exhibits to support his claim, and none contain new or reliable evidence of actual innocence. *See* Pet'r Exs. A-L (ECF Nos. 51, 54). Several exhibits are records from the police investigation or petitioner's trial, and they include no new information or facts to suggest petitioner's innocence. Pet'r Exs. E, F, G. Petitioner's exhibits also include treatment records of MH when she was five and fifteen years old; these records are likewise not new and include no information regarding petitioner's abuse of MH. Pet'r Exs. A, B, F.

The exhibits also include unsworn letters and emails written in 2006 and 2012 by Shelly Henderson, Cary Watson, and several other defense witnesses, repeating their stated beliefs that MH must have fabricated the allegations against petitioner. Pet'r Exs. C-D, H-L. These letters contain neither new information nor reliable evidence of actual innocence; they existed at the time of trial or during PCR proceedings, and they include no evidence that MH recanted her allegations. To the contrary, one exhibit references a 2011 statement by MH affirming her allegation that petitioner anally penetrated her, even though it felt like a "dream." Pet'r Ex. I at 2. This statement is consistent with MH's prior disclosures of this incident, where she described feeling sleepy and "groggy," perhaps because of "night pills" her mother routinely gave her. Tr. 114, 156, 228, 327, 542.

Accordingly, petitioner fails to establish a viable claim of actual innocence to excuse the procedural default of his unexhausted claims.

B. Ineffective Assistance of Counsel Claims

Respondent concedes that petitioner exhausted subparts (2), (3), and (5) of Ground One, except for the portions of subparts (2) and (5) noted above. In these claims, petitioner alleges

that trial counsel was ineffective by failing to impeach MH, failing to elicit testimony regarding MH's reputation for dishonesty; and failing to object to improper statements by the prosecutor during closing argument. The PCR court rejected these claims, and respondent maintains that the PCR court's decision is entitled to deference.

A federal court may not grant a habeas petition regarding any claim "adjudicated on the merits" in state court, unless the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A state court decision is "contrary to" federal law if it fails to apply the correct Supreme Court authority, or if it reaches a different result in a case with facts "materially indistinguishable" from Supreme Court precedent. *Brown v. Payton*, 544 U.S. 133, 141 (2005). A state court decision is an "unreasonable application" of clearly established federal law if the state court identifies the correct legal principle but applies it in an "objectively unreasonable manner." *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (per curiam); *see also Early v. Packer*, 537 U.S. 3, 11 (2002) (per curiam) (state court decisions may be set aside "only if they are not merely erroneous, but 'an unreasonable application' of clearly established federal law, or based on 'an unreasonable determination of the facts'").

Under well-established Supreme Court precedent, a habeas petitioner alleging ineffective assistance of counsel must show that 1) "counsel's performance was deficient," and 2) counsel's "deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish deficient performance, petitioner "must show that counsel's representations fell below an objective standard of reasonableness." *Id.* at 688. To demonstrate prejudice, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Unless

petitioner "makes both showings, it cannot be said that the conviction...resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687.

   1. Impeachment of MH

Petitioner contends that his trial counsel rendered inadequate assistance by failing to effectively cross-examine MH and impeach her testimony. The PCR court rejected this claim, finding "no proof [MH] would have admitted l[ying], regardless of what [trial counsel] asked" and "insufficient evidence that impeaching her on those minor inconsistencies would have affected the outcome of the case." Resp't Ex. 140 at 3. Petitioner fails to show that the PCR court's findings were unreasonable.

Petitioner argues that counsel failed to ask follow-up questions that would "expose contradictions or inconsistencies" in MH's version of events. Pet'r Br. at 38. However, petitioner fails to identify any contradictions or inconsistencies in any previous statement or report by MH that would have supported an aggressive cross-examination. Instead, petitioner maintains that counsel should have asked MH whether she told her mother, Shelly Henderson, and her mother's friend, Cary Watson, that she was only uncomfortable around petitioner and that she had disclosed no sexual abuse to them. Petitioner also argues that counsel failed to ask MH about petitioner's computer, including whether it was at their home where the abuse occurred. Pet'r Br. at 38-39.

However, counsel presented evidence about MH being "uncomfortable" around petitioner and the location of his computer through the testimony of petitioner, Shelly Henderson, Cary Watson, and other defense witnesses. Tr. 425-26, 453, 457, 495-96, 522, 530-31, 573, 592, 609-10. Counsel also asked MH whether she disclosed the nature of petitioner's abuse to her mother, and MH answered that she did, contrary to Henderson's testimony. Tr.

144-145, 495-96, 530-31, 572-73. Further, when counsel attempted to question MH about an incident with her friends that allegedly occurred before MH disclosed petitioner's abuse to a friend – an incident that purportedly made MH angry and led to the accusations against petitioner – MH denied that such an incident occurred. Tr. 143; *see also* Tr. 87, 496, 620-21. Although counsel's cross-examination of MH was not extensive, counsel attempted several lines of questioning and, over the prosecutor's objection, successfully admitted "apology" letters that MH had written to her mother and petitioner. Tr. 9, 143-45, 146-47, 158-60. Thus, the PCR court did not unreasonably apply *Strickland* in finding no prejudice arising from counsel's alleged deficiency in cross-examining MH.

　　2. <u>Testimony Regarding MH's Reputation for Honesty</u>

Next, petitioner contends that his trial counsel was constitutionally deficient by not questioning several witnesses about MH's character for truthfulness in order to impugn her credibility. Petitioner argues that several defense witnesses, if asked, would have testified that MH was not honest or truthful or had a reputation for dishonesty. Resp't Exs. 127-129.[2] Petitioner maintains that, instead, counsel repeatedly asked questions that led to inadmissible testimony regarding specific instances of MH's conduct.

Petitioner is correct that trial counsel did not ask defense witnesses whether MH had a reputation for dishonesty. Instead, counsel occasionally asked questions regarding specific acts of MH that exhibited either perceived misconduct or inappropriate behavior. *E.g.,* Tr. 481, 548-

---

[2] Petitioner also asserts that MH's mother "could have testified that MH had previously falsely accused others of molestation, and that evidence would be probative of MH's credibility." Pet'r Br. at 39. However, petitioner fails to cite any evidence in the record for this assertion, and the court was unable to find such evidence. Moreover, MH's mother had a full opportunity to testify and disclose such evidence, and she did not.

49. Nonetheless, the PCR court found no prejudice resulting from counsel's alleged failure, because several witnesses testified that MH told lies and "had tantrums." Resp't Ex. 140 at 3.

The PCR court's finding was not unreasonable in light of the testimony at trial. For example, Shelly Henderson testified that she did not confirm whether petitioner possessed child pornography on his computer, because she did not believe MH's allegations:

> Q: Okay. So what did you do to determine for yourself if there was pornography on [petitioner's] computer? Wouldn't that be something you'd look into?
>
> A: Um, yeah. Normally you would, except for, uh, I didn't believe my daughter.
>
> Q: Okay. You didn't believe her from the very first time she --
>
> A: No.
>
> Q: -- told you.
>
> A: And there's reasons I didn't believe her.

Tr. 571-72.

Henderson also testified that MH "was lying" the first time she disclosed petitioner's abuse to a friend's parents, because MH "wanted to stay longer" at her sister's house and had "learned" that the "molestation" story "worked for her." Tr. 495, 575. Henderson similarly suggested that MH was not truthful the second time she disclosed the abuse to another friend's mother. Henderson testified that MH was "ticked" at Henderson for "calling the police" on her friends, and the next day MH "ran away and had this big story behind her" that petitioner had "molested her and all this." Tr. 496; *see also* Tr. 583 (Henderson testifying "this is two years … of this lies"). Henderson also volunteered that MH was "not the most stable person," was "a handful," was "curious" about "sexual stuff," and had "flashed" her breasts to guests at the dinner table. Tr. 494, 500-01, 506.

Henderson and a family friend also testified that MH was "rebellious" and "would do anything" or "express any kind of misbehavior to get her way." Tr. 475, 507. Yet another family friend, Denise Varela, testified that MH would "attempt to manipulate people." Tr. 589. Varela also volunteered that MH had been abused by her biological father as a very young child, and MH "dressed like she was a sixteen year old" and "had makeup on" when she was only eleven or twelve. Tr. 441-42; *see also* Tr. 435 (another witness volunteering that MH had "been molested when she was little"). Yet another witness testified that MH "dressed inappropriately" and had emotional outbursts during a camping trip that caused the witness to feel like she was "held hostage" by MH's emotions. Tr. 472, 474-75.

Cary Watson, a close friend of Henderson's, made it clear that she did not believe MH's allegations. Watson testified that, after the first time MH disclosed petitioner's abuse to a friend's parents, she and Henderson "had to rush over" and talk to MH, because she "had, you know, come up with something." Tr. 453. With Henderson's permission, Watson confronted MH about the allegations and told MH that petitioner "will go to jail." Tr. 454. According to Watson, MH denied being sexually abused by petitioner and instead said that petitioner made her "uncomfortable." Tr. 453, 457. After MH answered, "I don't know" to several questions about petitioner's actions, Watson said, "We're going to have to call the police and you're going to have to tell the policeman something." Tr. 455. Watson testified that she then asked MH a series of specific questions, and MH denied that petitioner touched her "butt," her "boobs," or her "privates," and then MH "got up and ran off." Tr. 455.

Terena Woodard, a close friend of the family and MH's former daycare provider testified that MH "would lie. And, uh, she would tell – make up big stories, and the kids didn't want to be around her. And she sa – she would, um, throw tantrums around her friends and…I

would have to go down and pick her up at times because she was out of, um, control." Tr. 480. Watson, Woodard, and Henderson also testified that MH was "a troubled child," with "behavior problems." Tr. 456, 482, 584.

Several other witnesses, including MH's uncle and family friends, testified that MH repeatedly threw "tantrums" and "fits" that "scared" them. Tr. 429, 475-77, 486. Another male relative testified that MH made him "feel uncomfortable." Tr. 561. MH's own grandfather testified that he "had reason" to "fear" MH because of her "mental stability and her mental problems," and he even feared "physical, uh, problems" from her "anger." Tr. 547-49.

In sum, even if counsel did not ask the pertinent question regarding MH's alleged reputation for dishonesty, the majority of petitioner's witnesses all but called MH a liar, and several witnesses, including MH's mother, commented on the veracity of MH's allegations.

Moreover, testimony and evidence presented by the State corroborated the details of MH's allegations, including the child pornography found on petitioner's computers and the fact that petitioner tied a string around his testicles. Tr. 9, 118-19, 184-85, 229, 251-52, 320-21, 372-74, 397-99, 466-67, 527-28. Given the witness testimony and the evidence corroborating MH's allegations, it is not reasonably likely that testimony regarding MH's alleged reputation for dishonesty would have changed the outcome of trial. Accordingly, the PCR court reasonably found no prejudice arising from counsel's failure to elicit admissible character testimony from defense witnesses.

3. Prosecution's Closing Argument

Finally, petitioner argues that his counsel rendered constitutionally inadequate assistance when he failed to object, move for a mistrial, or request a limiting instruction after the prosecutor made the following comments during closing argument:

> Now before I talk about this and these incidents that she's able to describe, now if this is some fantasy – and her mother seemed to kind of allude today that she was some wannabe actress or this was something she was aspiring to and maybe we should give her an Academy Award for her testimony and everything she's gone through.
>
> Think about how difficult – if you're – for a minute here. For a child to talk about anal sodomy. Okay? Out of all the types of sexual abuse or sexual touching that you may conjure up in your mind, are you really, really going to go here? And the physical pain. How degrading and demoralizing is this? And this is something she's going to make up? It's not made up.

Tr. 669. Petitioner argues that the last statement – "It's not made up" – constituted impermissible vouching of MH and that competent counsel would have objected or requested a mistrial or limiting instruction. The PCR court rejected this claim and found that the prosecutor "did not vouch" for MH. Resp't Ex. 140 at 3. This finding was reasonable.

It is well established that a prosecutor should not "vouch" for the credibility of a witness, state a personal opinion of the evidence, or express a belief in the guilt of the accused. *E.g., United States v. Young*, 470 U.S. 1, 17-19 (1985). "Improper vouching occurs when the prosecutor places the prestige of the government behind the witness by providing personal assurances of the witness's veracity." *United States v. Stinson*, 647 F.3d 1196, 1212 (9th Cir. 2011) (citation and internal quotation marks omitted).

Here, the prosecutor did not give "personal assurances" of MH's veracity. Rather, in light of the witness testimony, the prosecutor's statement could be reasonably construed as a comment on the evidence heard by the jury and a rebuttal to the defense theory that MH fabricated the allegations against petitioner. *United States v. Nash*, 115 F.3d 1431, 1439 (9th Cir. 1997) (finding the prosecutor's statements that the witnesses had no "motive to lie" "were simply inferences from evidence in the record"); *see also Heroff v. Coursey*, 280 Or. App. 177, 194, 380 P.3d 1032 (2016) (explaining that "it is permissible for a prosecutor to argue that the

jury should infer that a witness is credible based on the evidence in the record, so long as the prosecutor does not vouch for the witness by interjecting his or her personal opinion of the witness's credibility"). In this context, the PCR court reasonably found that the prosecutor's statement did not constitute impermissible vouching and petitioner suffered no prejudice when counsel failed to object.

Accordingly, petitioner fails to establish that the PCR court unreasonably applied *Strickland* in rejecting his claims of ineffective assistance of trial counsel, and petitioner is not entitled to habeas relief.

## CONCLUSION

The Amended Petition for Writ of Habeas Corpus (ECF No. 13) is DENIED and this case is DISMISSED. A Certificate of Appealability is denied on the basis that petitioner has not made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2).

DATED this 9th day of March, 2020.

                                                s/ Michael J. McShane
                                                Michael J. McShane
                                                United States District Judge